IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TODD WHITE, | ) |
| | ) |
| Plaintiff, | ) JURY TRIAL DEMAND |
| v. | ) |
| | ) |
| | ) Civil Action No. 3:10-00863 |
| RICKY BELL, Warden, in his | ) |
| individual and official capacity as the | ) |
| warden of Riverbend Maximum | ) JUDGE HAYNES |
| Security Institution, | ) |
| | ) |
| JOEL D. RADER, JR. Corporal, in his | ) |
| individual and official capacity as a | ) |
| Correctional officer at Riverbend | ) |
| Maximum Security Institution, | ) |
| | ) |
| STEPHEN G. RAYNO, in his individual | ) |
| and official capacity as a Correctional | ) |
| officer at Riverbend Maximum | ) |
| Security Institution, | ) |
| | ) |
| JOSHUA MCCALL, Corporal in his | ) |
| individual and official capacity as a | ) |
| Correctional officer at Riverbend | ) |
| Maximum Security Institution, | ) |
| | ) |
| GAELAN DOSS, in his individual | ) |
| and official capacity as a Correctional | ) |
| officer at Riverbend Maximum | ) |
| Security Institution, | ) |
| | ) |
| SEAN STEWART, in his individual | ) |
| and official capacity as a Correctional | ) |
| officer at Riverbend Maximum | ) |
| Security Institution, | ) |
| | ) |
| BRIAN BALDWIN, Lieutenant, and in | ) |
| his individual and official capacity as a | ) |
| Correctional officer at Riverbend | ) |

1

EXHIBIT  A

| Maximum Security Institution, | ) |
| --- | --- |
| | ) |
| GREGORY GARNER, aka: "Corporal | ) |
| COUNTRY JOE," in his individual | ) |
| and official capacity as a Correctional | ) |
| officer at Riverbend Maximum | ) |
| Security Institution, | ) |
| | ) |
| JAMES BOSSOW, in his individual | ) |
| and official capacity as a Correctional | ) |
| officer at Riverbend Maximum | ) |
| Security Institution, | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

### I. INTRODUCTION.

This is an action pursuant to 42 U.S.C. § 1983 arising from an assault to Plaintiff Todd White that occurred at the Riverbend Maximum Security Institute as a result of actions and/or inactions of the Defendants, all of whom where acting under color of state law.

### II. JURISDICTION AND VENUE.

1. The Court has jurisdiction over this action for violation of an inmate's rights based on cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

2. Venue is proper in this Court since the allegations which give rise to the cause of action occurred at Riverbend Maximum Security Institution, 7475 Cockrill Bend Blvd., Nashville, Tennessee 37209.

3. Plaintiff White has previously exhausted his administrative remedy to seek redress in this action as a result of a grievance that he filed on or about June 17, 2010.

2

4. The grievance filed by Plaintiff White was determined to be "inappropriate" by prison officials at Riverbend Maximum Security Institution.

5. This is the first court action filed by Plaintiff White as a result of a violation of his federally-protected civil rights pursuant to 42 U.S.C. § 1983.

### III. THE PARTIES.

6. Plaintiff TODD WHITE is an inmate incarcerated at Riverbend Maximum Security Institution, Unit 1- D 112, 7475 Cockrill Bend Blvd, Nashville, Tennessee 37209-1048.

7. Defendant RICKY BELL was the Warden at Riverbend Maximum Security Institution as the time of the event described in the First Amended Complaint. Defendant Bell is sued in his individual, and in his official capacity.

8. Defendant JOEL D. RADER, JR., is a Corporal employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Rader is sued in his individual, and in his official capacity.

9. Defendant STEPHEN G. RAYNO, is a Correctional Officer employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Rayno is sued in his individual, and in his official capacity.

10. Defendant JOSHUA MCCALL, is a Corporal employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant McCall is sued in his individual, and in his official capacity.

11. Defendant GAELAN DOSS, is a Correctional Officer employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Doss is sued in his individual, and in his official capacity.

3

12. Defendant SEAN STEWART, is a Correctional Officer employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Stewart is sued in his individual, and in his official capacity.

13. Defendant BRIAN BALDWIN, is a Lieutenant employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Baldwin is sued in his individual, and in his official capacity.

14. Defendant GREGORY GARNER (aka: "Corporal Country Joe") is a corporal employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Garner is sued in his individual, and in his official capacity.

15. Defendant JAMES BOSSOW is a Correctional Officer employed by the Tennessee Department of Corrections and assigned to Riverbend Maximum Security Institution. Defendant Bossow is sued in his individual, and in his official capacity.

16. Each of the Defendant are sued individually, and in their official capacity. At all times material, the Defendants were acting under the color of state law.

## IV. STATEMENT OF FACTS.

17. On or about May 31, 2010, and while incarcerated at the Riverbend Maximum Security Institution ("RMSI"), Plaintiff White was housed in Unit 1, a maximum security-housing unit.

18. Inmates housed in Unit 1 are locked in their cells 23 hours per day, and all 24 hours on weekends and holidays.

19. The only time that inmates are allowed out of their cells is to shower (three times per week), recreation, medical, legal visits, and regular visits with immediate family behind a glass partition for one hour each week.

4

20. Any time that inmates are moved outside their cells, they are first put in full restraints; *i.e.*, handcuffs and chains around their waist.

21. There is a security flap on each cell door that allows the correctional officers ("C/O") to insert food, mail, and distribute medication, as well as secure the inmate before the cell door is opened.

22. On Monday, May 31, 2010 (Memorial Day) at approximately 2:15 p.m., the second shift officer whose last name is believed to be "Russell" entered the pod area to do rounds. Plaintiff White, along with other inmates, asked C/O Russell if the inmates were going to be allowed to shower, since they are only allowed to shower on Monday, Wednesday, and Friday.

23. C/O Russell informed Plaintiff White, and the other inmates, that "per Cpl. McCall's orders", there would not be any showers issued on May 31, 2010, and further stated that Defendant McCall said the unit was on "holiday schedule."

24. There are twenty-four (24) inmates assigned to each pod in Unit 1.

25. When C/O Russell informed the inmates in the pod of this action, most of the inmates, including Plaintiff White, began to bang on the cell doors, and a request was made by several of the inmates to see the officer in charge ("OIC"), which was Defendant McCall.

26. Within a few minutes of this occurrence, Defendant McCall stepped into the trap gate area of the door entering into the pod to Unit 1.

27. Defendant McCall shouted, "there will not be any showers" because Unit 1 was on holiday schedule, and this was instructed by Unit Manager Mike Slaughter.

28. Defendant McCall further stated that if anyone had a problem with his directive, that they should take it up with the unit manager. Defendant McCall then left C-pod.

5


29. At approximately 4:00 p.m., a nurse practitioner who it is believed is named "Lisa Hayes," along with C/O Wilson entered into the pod to Unit 1 so as to allow the Ms. Hayes to distribute medication.

30. When Ms. Hayes and C/O Wilson approached cell number 202, C/O Wilson opened the security flap on cell door 202 to give the inmate his medication.

31. Upon information and belief, the inmate in cell 202 tried to throw some type of liquid on C/O Wilson, some of the liquid may have gotten on his shirt.

32. After passing out the rest of the medication, C/O Wilson and Ms. Hayes exited the pod in Unit 1.

33. Approximately 30 to 45 minutes later, Defendant McCall, Defendant Rader, Defendant Rayno and Defendant Bossow returned to the pod in Unit 1, and went to cell 202.

34. Defendant McCall informed Ryan Honeycutt, Inmate No. 329275, in cell 202 to back up to the cell door and be handcuffed.

35. Defendant McCall radioed to an officer working in the control booth to electronically open cell door 202.

36. Once cell door 202 was opened, Defendants McCall, Rayno, Rader and Bossow rushed inside the cell and began to beat inmate Ryan Honeycutt.

37. Plaintiff White heard and later observed Honeycutt's injuries, including but not limited to a busted nose. Ryan Honeycutt was chained and left in his cell in an injured condition for the rest of the evening.

38. After approximately one (1) hour, C/O's Wilson, Russell, Bishop and Garrison came into the pod to Unit 1 to pass out dinner trays, going from cell to cell.

6

39. When the officers approached Plaintiff White's cell door, Plaintiff White informed them that he knew what had occurred to Ryan Honeycutt and that someone should inform the shift commander.

40. Plaintiff White took an empty milk carton, got some water from out of the sink along with some cold, black coffee left over from breakfast, and threw it on the officers through the security flap to the cell door.

41. One of the C/O's shut the security flap and continued to pass out trays and tea, and left the pod to Unit 1 for what seemed to be about 30 minutes.

42. Defendants McCall, Rader, and Rayno returned to the pod of Unit 1. Defendant Bossow was also present, and it is believed that he was carrying an electric shield.

43. Defendant McCall told Plaintiff White to "turn your fucking ass around and back up to this door, you must didn't see what we just done to that other fucking asshole."

44. Plaintiff White stated to Defendant McCall that he did see what they had just done (referring to Ryan Honeycutt), and because of that he was not going to voluntarily be handcuffed unless Defendant McCall notified the shift commander, and that he was accompanied with a video recorder.

45. Plaintiff White told Defendant McCall, and the other Defendants, that he was in fear for his safety as a result of what he witnessed as to Ryan Honeycutt.

46. Defendant McCall threatened Plaintiff White by telling me him that he "had my ass" and that "my ass was his."

47. Defendant Rader told Plaintiff White that "I needed to hold what I got" because he would be right back to "whip my ass, because I had it coming."

7

48. Defendants McCall, Rader, Rayno, and Bossow left the pod to Unit 1, and at approximately 7:00 p.m. returned, with the C.E.R.T. unit, and accompanied by Defendant Baldwin and Defendant Garner.

49. When the Defendants approached Plaintiff White's cell, Defendant Baldwin asked Plaintiff White what was the problem.

50. Plaintiff White told Defendant Baldwin that he believed the other Defendants were going to beat him like they did to Ryan Honeycutt earlier in the day.

51. Plaintiff White told Defendant Baldwin that he did not have a problem with being handcuffed since Defendant Baldwin was there to insure his safety.

52. One of the Defendants told Plaintiff White that he did not have to worry about being beaten, because it was going to be done "by the book," and that a camcorder was there to film it.

53. Plaintiff White was instructed by Defendant Baldwin to get on the floor, and on his knees facing the wall. Plaintiff White was also instructed by Defendant Baldwin to place his hands behind his back.

54. Plaintiff White complied with the instruction of Defendant Baldwin, and one of the Defendants requested the control booth to unlock the cell door.

55. When the cell door was opened, the Defendants proceeded to punch and kick Plaintiff White about the body.

56. Upon information and belief, Plaintiff White was electrocuted by Defendant Bossow who he believes was holding an electrical shield while standing at the cell door.

57. While Plaintiff White was being electrocuted by the electrical shield, the other Defendants continued to beat Plaintiff White about the head and body.

58. Plaintiff White was then pushed up against his bunk where he was brutally assaulted by the Defendants, who proceeded to kick and beat Plaintiff White with their fists for several minutes.

59. Plaintiff White was handcuffed and shackles were placed on his legs.

60. While still restrained in handcuffs, one of the Defendants hit Plaintiff White in his eye with enough force that it knocked him unconscious for some period of time, and he was awakened by more blows to his face and body.

61. Plaintiff White did not threaten the security of the Defendants, or the institution.

62. The Defendant officers pressed their knees into Plaintiff White's back with enough force that he had difficulty breathing, and severe enough to cause Plaintiff White to believe that he was going to die.

63. Plaintiff White was pulled to a standing position, and then hit from behind with enough force that his head struck a concrete wall in the cell.

64. Each cell has a window that is approximately four inches wide and approximately three feet tall.

65. When the Defendants struck Plaintiff White from behind while in handcuffs, Plaintiff White hit his head on the corner of the window causing his forehead to split open from the top of his hairline to between his eyes brows.

66. After being brutally assaulted by the Defendants and continually shocked, Defendant Baldwin instructed the other Defendants that "that was enough, bring him out of the cell." The Defendants picked up Plaintiff White by his cuffed hands and shackled feet, and carried him out of the cell.

67. Plaintiff White was carried down a staircase and slammed on the floor at the bottom of

the steps.

68. Plaintiff White was then dragged across the floor to a door leading out to the recreational yard, at which point Plaintiff White was dragged outside and across rough concrete sustaining numerous and additional abrasions.

69. After realizing the severity of bleeding and spitting up blood by Plaintiff White, Defendant Baldwin instructed the other Defendants to notify medical personnel.

70. After approximately 10 to 20 minutes, a nurse practitioner who was believed to be "Wanda" arrived, and proceeded to examine Plaintiff White.

71. Upon witnessing Plaintiff White's head injury, she began to wrap it to try and stop the bleeding. She shouted to the Defendants that "you all need to get him to the infirmary now."

72. After the nurse practitioner finished wrapping Plaintiff White's head, the Defendants walked Plaintiff back through the pod to Unit 1.

73. Instead of using a medical cart to carry Plaintiff White to the infirmary, Plaintiff White was forced to walk a considerable distance on foot around on the compound-access road which is approximately one-quarter mile. Plaintiff White continued to bleed from his injuries and was in severe pain as a result of the assault and shackles on his legs, which were placed too tight on him by the Defendants so that it made it difficult to walk.

74. When Plaintiff White arrived at the infirmary, medical staff determined that he needed to immediately go to the hospital. Defendants forced Plaintiff White to sit in the infirmary for approximately one (1) hour with his hands cuffed behind his back. Defendants placed the handcuffs and shackles on so tight that they it cut into the circulation of his hands and feet. As a result of this, Plaintiff White suffers pain and nerve damage to his wrist and legs.

10

75. Before Plaintiff White was transported to Meharry Hospital for medical treatment, the transporting officers removed the cuffs from Plaintiff White so as to allow him to change his bloody shirt. Plaintiff White was informed by the transporting officers that the blood on his shirt "would make the prison officials look bad."

76. Plaintiff White sustained numerous injuries as a result of the assault by the Defendants, including but not limited to the injury to his face and head sutures and approximately ten to fifteen staples. Plaintiff White's knee was injured in the assault, and he suffers from frequent headaches. Plaintiff White also experiences constant fear of being assaulted again, and has experienced threats of retaliation. Plaintiff White has a large scar running down the center of his forehead that is permanent, and caused by the assault from the Defendants.

77. Upon information and belief, Defendant Bell, who at the time of the incident was the warden at RMSI, knew or should have known that Defendants Rader, Bossow, Rayno, McCall, Doss and Baldwin ("the Defendant officers") had a history of abusing and/or assaulting prisoners at RMSI through their work on the Cell Extraction Team.

78. Defendant Bell was directly responsible for the proper training and supervision of the Defendant officers working at RMSI, and has shown a deliberate indifference to the safety of Plaintiff White, and other inmates.

79. Upon information and belief, Plaintiff White believes that Defendant Rader had previously been investigated (and reprimanded) for participating with other C/O's in assaulting prisoners, spitting and urinating in their food.

80. Upon information and belief, Plaintiff White believes that Defendant McCall has previously been investigated (and reprimanded) for participating with other C/O's in assaulting

11

prisoners.

81. Upon information and belief, Plaintiff White believes that Defendant Rayno has previously been investigated (and reprimanded) for participating with other C/O's in assaulting prisoners.

82. Upon information and belief, Plaintiff White believes that Defendant Baldwin has previously been investigated (and reprimanded) for participating with other C/O's in assaulting prisoners, and also coverups as to the wrongdoing.

83. Upon information and belief, Plaintiff White believes that Defendant Garner has previously been investigated (and reprimanded) for participating with other C/O's in assaulting prisoners, as well as coverups of the wrongdoing. It is further believed that Defendant Garner improperly used the video camera during Plaintiff White's cell extraction.

84. Upon information and belief, Plaintiff White believes that Defendant Stewart has previously been investigated (and reprimanded) for participating with other C/O's in assaulting prisoners, and also coverups of the wrongdoing.

85. Upon information and belief, Plaintiff White believes that some or all of the named Defendants have been terminated, or allowed to resign, as a proximate result of the incident which occurred on May 31, 2010.

## V. CLAIMS FOR DAMAGES (42 U.S.C. § 1983).

### A. FIRST CLAIM FOR RELIEF AS TO DEFENDANTS RADER, RAYNO, MCCALL, DOSS, STEWART, BALDWIN, AND GARNER.

86. Plaintiff White re-alleges and incorporates by reference paragraphs 1-85.

87. The actions or inactions of the Defendants which resulted in the beating and assault of

Plaintiff White were done under color of state law and in a manner which caused Plaintiff to suffer constitutional violations. Specifically, the Defendants operated to violate Plaintiff's right to not be subject to cruel and unusual punishment as secured under the Eighth Amendment, and Plaintiff's right to equal protection under the Fourteenth Amendment. A reasonable person would have known that these constitutional rights were clearly established at the time of the assault by the Defendants.

88. The Defendants operated to violate Plaintiff's constitutional rights as protected by the Civil Rights Act of 1871, 42 U.S.C. § 1983.

89. All of the Defendants have practiced a policy of violating individual civil rights in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

90. The conduct of the Defendants was intentional, reckless, deliberate, and/or malicious, and was done in a total disregard and indifference for the safety of Plaintiff White, and caused him to endure unnecessary pain and suffering as a proximate result of the constitutional violations.

91. While not every Defendant listed may have personally touched Plaintiff White, each of the Defendants were individually and jointly responsible because each Defendant participated in or assisted in the assault, and any reasonable person should have known that the conduct described herein constituted objectively unreasonable force which created an inevitability of serious injury, and that such was a violation of Plaintiff White's clearly established constitutional rights as to the time of his injuries.

92. Some of the Defendants were personally involved in or triggered the constitutional violations, or while acting in a supervisory capacity failed or refused to remedy a continuing and egregious constitutional violation after receiving notice of it.

93. Some of the Defendants in this case inflicted force sadistically and maliciously for

the sole purpose of causing pain to Plaintiff White in a manner that constituted gratuitous violence.

94. The amount of force used in this case was grossly disproportionate to the need to apply force or maintain discipline at RMSI. Plaintiff White was confined alone in his cell and was of no danger to anyone such as guards, other prisoners, or even himself. There was no emergency or compelling circumstance for the Defendants to have assaulted Plaintiff White when he was not an imminent threat.

95. The force used here was not in a good faith effort to maintain or restore discipline. Rather, Defendants acted maliciously, sadistically, unnecessarily, unprofessionally, and wantonly with intent or desire to cause harm and pain to Plaintiff White.

96. Because there was no emergency or urgent necessity to remove Plaintiff White from his cell, the heightened standard of "excessive" force against a prisoner, which requires subjective proof of malicious or sadistic intent, does not apply. Rather, because this case involves the "planned" use of force, Plaintiff White need establish only deliberate indifference and the Defendants were at least aware of the substantial risk of serious harm and acted or failed to act despite that awareness. However, Plaintiff does not waive any arguments or claims under the heightened standard and expressly asserts in the alternative that Plaintiff can meet that standard for each of the Defendants.

97. After Plaintiff White was handcuffed and restrained there was no need to increase the severity of violence against him by the Defendants. The severity of force by the Defendants should have been reduced rather than escalated.

98. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff White was deprived of his civil and constitutional rights.

99. The actions of the Defendants violated Plaintiff White's civil rights as protected by the

14

Civil Rights Act of 1871, 42 U.S.C. §1983. Plaintiff White is entitled to damages for the suffering, harm and damage caused as a proximate result of the actions of the Defendants.

## B. SECOND CLAIM FOR RELIEF AS TO DEFENDANT BELL.

100. Plaintiff White re-allege and incorporate by reference paragraphs 1- 99.

101. The actions and inactions of Defendant Bell which resulted in the assault of Plaintiff White were done under color of state law, and in a manner which caused Plaintiff White to suffer constitutional violations. Specifically, Defendant Bell through his failure to adequately train and supervise his staff operated to violate Plaintiff White's right to be free from cruel or unusual punishment as secured to him under the Eighth Amendment to the Constitution of the United States of America, and Plaintiff White's right to be accorded equal protection under the laws as guaranteed under the Fourteenth Amendment to the Constitution of the United States. A reasonable person would have known that these constitutional rights were clearly established at the time of the alleged wrongful conduct, and that such conduct violated these rights.

102. The actions and inactions of Defendant Bell as alleged in this First Amended Complaint were such that he was or should have been aware of the substantial risk of harm, but he acted or failed to act despite that awareness and knowledge.

103. With respect to the failure to train, Defendant Bell was aware that a lack of training or inadequate training as to the Defendant guards created a substantial risk that prisoners would unnecessarily suffer serious harm, yet failed to provide adequate training despite that awareness and knowledge.

104. Defendant Bell was aware that the inadequate training or lack of training on the use of force was likely to lead to constitutional violations. Defendant Bell had actual notice of such

15

Case 3:10-cv-00863   Document 113   Filed 04/25/12   Page 15 of 19 PageID #: 394

violations from prior assaults, but failed to provide proper training.

105. Defendant Bell was the ultimate supervisor at RMSI, and had knowledge of and acquiesced in the constitutional violations committed by his subordinates, including but not limited to the Defendant guards in this action.

106. There was a causal connection between Defendant Bell's actions and inactions in supervision and the constitutional violations afflicted on Plaintiff White. There was a history of physical abuse which would have put Defendant Bell on notice of the need to correct the deprivations, yet he failed to do so.

107. Defendant Bell's customs and/or policies of providing insufficient training and oversight as to the guards at RMSI constituted deliberate indifference to the constitutional rights of Plaintiff White.

108. Upon information and belief, Defendant Bell directed subordinates to act unlawfully or knew that subordinates would act unlawfully, and failed to stop or correct them from doing so.

109. Defendant Bell's actions and inactions violated clearly established constitutional law and Defendant Bell was on notice of his potential liability, particularly where the assault of an inmate at the hands of guards was a probable result of the direct actions and polices of Defendant Bell.

110. As a direct and proximate result of the unlawful conduct of Defendant Bell stated herein, Plaintiff White was deprived of his civil rights.

111. The actions of Defendant Bell violated Plaintiff White's civil rights as protected by the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff White is entitled to damages for the suffering and harm occasioned by Defendant Bell's wrongful conduct, as well as all losses and

damages to Plaintiff White.

## VI. DAMAGES.

112. Plaintiff White re-allege and incorporate by reference paragraphs 1- 111.

113. As a direct and proximate result of the aforementioned acts and/or omissions of the Defendants, Plaintiff White is entitled to recover damages. The damages for which Plaintiff White seeks compensation from the Defendants, both jointly and severally, include but are not limited to the following:

   a.  Compensatory damages for the physical, mental, and emotional pain and suffering of Plaintiff White as a proximate result of the assault.

   b.  Punitive damages.

## VII. PRAYER FOR RELIEF.

**WHEREFORE**, Plaintiff Todd White respectfully prays that his Court enter judgment granting him the following:

   A.  A declaration that the acts and omission described herein violated Plaintiff's rights under the Constitution and laws of the United States.

   B.  A preliminary and permanent injunction ordering Defendants Ricky Bell, Joel D. Rader, Jr., Stephen Rayno, Joshua McCall, Gaelen Doss, Sean Stewart, Brian Baldwin, Gregory Garner, and James Bossow ("the Defendants") to not further retaliate against Plaintiff White for the filing or pursuit of this lawsuit, or from any continually harassment of the Plaintiff.

   C.  Compensatory damages to Plaintiff White in the amount of $100,000.00 against each of the Defendants, jointly and severally.

17

D.  Punitive damages in the amount of $200,000.00 against each of the Defendants as a proximate result of their wrongs and constitutional violations against Plaintiff White.

E.  Additional and future damages awarded to Plaintiff White against the Defendants in an amount to be determined by the jury to pay for future medical treatment, including but not limited to plastic surgery for the permanent scar on Plaintiff's face and head caused by the Defendants.

F.  A jury trial on all issues triable by jury.

G.  Court costs in this action, including discretionary costs.

G.  Any additional relief this court deems just, proper, and equitable.

**THE LAW OFFICE OF DAVID L. COOPER, P.C.**

_s/ David L. Cooper_
**DAVID L. COOPER, BPR # 11445**

Third Avenue North Building
208 Third Avenue, North, Suite 300
Nashville, TN 37201
(615) 256-1008

**DURHAM & DREAD, PLC**

_s/ Benjamin E. Winters_
**BLAIR DURHAM, BPR# 21453**
**BENJAMIN E. WINTERS, BPR# 23970**

1709 19th Avenue, South
Nashville, TN 37212
(615) 252-9937

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the **Second Amended Complaint** has been delivered by the Court's CM/ECF system, to **Jennifer L. Brenner, Esq.**, Civil Rights & Claims Division, Officer of the Attorney General & Reporter, P.O. Box 20207, Nashville, TN 37202-0207; and **William B. Herbert, Esq. and Alan D. Johnson, Esq.**, Johnson & Herbert, 211 Union Street, Suite 200, Nashville, TN 37201 on this 23rd day of April, 2012.

              s/ David L. Cooper
              **DAVID L. COOPER**